**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **AGILON ENERGY HOLDINGS II, LLC,** *et al.* | § | Case No. 21-32156 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**DECLARATION OF HUGH SMITH IN SUPPORT OF**
**CHAPTER 11 PETITIONS, FIRST DAY MOTIONS, AND DEBTORS'**
**EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING**
**SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364,**
**(II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO**
**11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION PURSUANT**
**TO 11 U.S.C. §§ 361, 363 AND 364, AND (IV) GRANTING RELATED RELIEF**

I, Hugh Smith, hereby declare under penalty of perjury:

1.      I, through my LLC am the sole manager of Agilon Energy Holdings II, LLC ("Agilon"), Victoria Port Power LLC ("Victoria Port"), and Victoria City Power LLC ("Victoria City", and together with Victoria Port, the "Project Companies", and together with Agilon, the "Debtors").  I was appointed to serve in this role on June 25, 2021.  Prior to my appointment as sole manager of the Debtors, I served as an independent consultant to the Debtors pursuant to a Consulting Agreement dated as of December 8, 2020[2].  I am generally familiar with the Debtors' assets, liabilities, and operations.  I have over thirty-five years of experience in the energy industry and power sector, having served most recently as President of Greenleaf Power, LLC, a renewable

---

[1]      The debtors and debtors in possession in these chapter 11 cases (the "Cases"), along with the last four digits of their respective Employer Identification Numbers, are as follows: Agilon Energy Holdings II, LLC (3389), Case No. 21-32156; Victoria Port Power LLC (4894), Case No. 21-32157; and Victoria City Power LLC (4169), Case No. 21-32158. The Debtors' mailing address is: 5850 San Felipe, Ste 601, Houston, Texas 77057.

[2] On December 15, 2020, the consulting contract was assigned to Hugh Smith Advisors, LLC, a limited liability company wholly owned by Hugh Smith.

energy provider, from 2010-2018.  Since that time, I have consulted with various clients regarding matters in the electric energy industry.

2.      I submit this declaration (the "<u>Declaration</u>") in support of the voluntary petitions for relief filed on June 27, 2021 (the "<u>Petition Date</u>"), and to assist the Court and other parties-in-interest in understanding the circumstances that led to the commencement of these chapter 11 proceedings.  I am over the age of 18, and I am authorized to submit this Declaration on behalf of the Debtors.

3.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by Debtors' former management or the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations, financial affairs, and restructuring initiatives.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

4.      To resolve immediate issues that may cause irreparable harm to the Debtors' estates if not promptly addressed, the Debtors have requested various types of relief in "first day" applications and motions (collectively, the "<u>First Day Pleadings</u>") in connection with these chapter 11 cases.  I have reviewed and am familiar with the contents of each First Day Pleading (including the exhibits attached thereto), and believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful restructuring of the Debtors; (c) best serve the Debtors' estates; and (d) is, in those instances where the relief seeks

immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm to the Debtors' estates.

## INTRODUCTION[3]

5.     The Debtors are in the business of providing gas-fired peaking electric energy to the ERCOT market.  The Debtors own and operate two power facilities located near Victoria, Texas: Victoria Port Generation Station ("Victoria Port Facility") and Victoria City Generation Station ("Victoria City Facility" and together with Victoria Port, the "Facilities").  When fully functional, the Facilities have a total nominal capacity of 172 Megawatts.  The Facilities each incorporate two refurbished LM6000 aero-derivative combustion turbines and associated generators manufactured by General Electric.

6.     During the construction of the Facilities, certain disputes arose that increased costs and delays in bringing the Facilities online.  These delays contributed substantially to the Debtors' inability to timely generate revenues, resulting in the occurrence of defaults under the Debtors' prepetition financing agreements.  Although the Facilities became commercially operational, additional maintenance issues with the refurbished combustion turbines resulted in additional delays and expenses.

7.     In light of these circumstances, the Debtors began exploring debt restructuring options with the Prepetition Secured Parties.  The Debtors were making progress toward resolving their operational issues when, in February 2021, an extraordinary cold weather event occurred in Texas.  The Debtors' combustion turbine engines were isolated from the ERCOT grid at one facility due to a transmission outage and faced operating constraints due to the extreme low temperatures.  Unable to generate all of the electricity contractually obligated to provide during

---

[3] Capitalized terms not otherwise defined in this Introduction shall have the meaning ascribed to them elsewhere in this Declaration.

the cold weather event, the Debtors were forced to incur additional liabilities for an large amount of purchased power, which led to the termination of the Debtors' supply and purchase agreements and, ultimately, to the filing of these chapter 11 cases.

8.      Despite these difficulties, with post-petition financing, the Debtors can operate a viable business to maximize value during these chapter 11 cases.  To achieve this goal, the Debtors have filed various First Day Pleadings and have negotiated a *Debtor in Possession Financing Term Sheet* pursuant to which they will request immediate access to $1 million in emergency post-petition financing.  This much needed liquidity will permit the Debtors to stabilize their businesses, smoothly enter chapter 11, resume power production, and allow sufficient time to negotiate a robust financing package to fund the Cases.

9.      While stabilizing the Debtors' business operations and taking steps to restart power production, the Debtors and their professionals will commence a robust sale process with the intention of selling their businesses as a going concern.  Selling the Debtors' assets free and clear pursuant to section 363 of the Bankruptcy Code will avoid much of the complexities associated with their assets and will maximize the value of their business.

**BACKGROUND OF THE DEBTORS' BUSINESS AND OPERATIONS**

**(a)      Formation of the Debtors and Organizational Structure.**

10.      The Debtors were formed in 2016 in the State of Texas as affiliated independent power producers.  They were founded by Ryan Castleman and Gerardo P. Manalac.  Mr. Castleman served as CEO of the Debtors and Mr. Manalac serves as president.  The majority ownership of the Debtors rests indirectly with Mr. Castleman.

11.     The Debtors' organizational structure is as follows:



**(b)     The Facilities.**

12.     Partially financed by the Senior Notes and Subordinated Notes (each as defined below), the Project Companies constructed and operated the Facilities.  The Victoria Port Facility, a nominal 86  MW gas-fired powerplant, commenced commercial operations in 2019.  The Victoria City Facility, also a nominal 86 MW gas-fired powerplant, commenced commercial operations in 2020.  The Debtors have no employees.  Instead, the Facilities have been operated by various contractors pursuant to prepetition agreements with the Debtor.  At this time, the Debtors need liquidity to resolve outstanding maintenance constraints and recommence operations at the Facilities.

13.     The Facilities were intended to provide energy during times of peak demand.  When operational, the Facilities provide electricity to the Electric Reliability Council of Texas

("ERCOT"), which operates the electric grid and manages the deregulated energy market for approximately 75% of the State of Texas.

**(a)     Senior Secured Notes and Other Funded Debt.**

14.     As of the Petition Date, the principal amount of the Debtors' funded debt obligations total approximately 93 million, comprised of $67,337,975 of principal and interest outstanding on the Senior Notes, and approximately $26,000,000 of principal and interest outstanding on the Subordinate Notes.

15.     Pursuant to that certain *Senior Secured Note Purchase Agreement* dated as of February 23, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Senior Secured NPA" and, together with the other "Financing Documents" as defined therein, the "Prepetition Senior Secured Note Documents") among, *inter alia*, (a) Agilon, (b) the guarantors party thereto (the "Prepetition Guarantors"), (c) Wilmington Trust, National Association, as the Collateral Agent under the Collateral Agency Agreement (each as defined in the Prepetition Senior Secured NPA, in such capacity, the "Prepetition Agent"), and (d) the purchasers and noteholders party thereto (collectively, the "Senior Secured Noteholders" and together with the Prepetition Agent, and all other secured parties under the Prepetition Senior Secured Note Documents, the "Prepetition Secured Parties"), Agilon issued senior secured term notes issued under the Prepetition Senior Secured NPA in the initial aggregate principal amount of $50,000,000 (the "Term Notes" as defined in the Prepetition Senior Secured Note Documents) and senior secured revolving notes issued under the Prepetition Senior Secured NPA in the aggregate principal amount of $23,000,000 (the "Revolving Notes" as defined in the Prepetition Senior Secured Note Documents, and, together with the Term Notes, the "Senior Notes").  As of

the Petition Date, the aggregate outstanding principal amount of the Senior Notes was not less than approximately $$67,337,975.[4]

16.     As security for the Senior Notes, the Debtors granted to the Prepetition Agent for the benefit of the Prepetition Senior Secured Note Parties, first priority liens upon and senior security interests in (the "Prepetition Liens") substantially all of the Debtors' property and assets (collectively, the "Prepetition Collateral").  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

17.     As described further herein, both payment and technical Events of Default have occurred and are continuing under the Prepetition Senior Secured Note Documents.

18.     Pursuant to a separate *Securities Purchase Agreement* dated as of February 23, 2018 (as amended, restated, or otherwise supplemented from time to time, the "SPA"), Agilon II also issued $22 million in Senior Subordinated Notes due 2025 (the "Subordinated Notes").  The Subordinated Notes are subordinate in all respects to the Senior Notes.  As of the Petition Date, the aggregate principal amount outstanding, excluding fees and expenses, on account of the Subordinated Notes was not less than approximately $26,000,000[5].

**(d)     Other Trade and Miscellaneous Unsecured Debt.**

19.     The Debtors estimate that as of the Petition Date claims of other trade and miscellaneous unsecured creditors exceeded $14.5 million, plus Shell Energy North America

---

[4] Such amount does not include interest, default interest, make-whole, other premiums, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations that may be due and payable under the Senior Notes and the other Prepetition Senior Secured Note Documents.

[5] Such amount does not include interest, default interest, make-whole, other premiums, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and obligations that may be due and payable under the Subordinated Notes.

(U.S.), L.P. ("SENA") asserts it holds a claim against the Debtors somewhere between $68 million and $80 million, as described in more detail below.

## EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES AND PREPETITION RESTRUCTURING EFFORTS

20.     The Debtors have faced operational and financial difficulties since their formation.

**(a)     Delays in Project Completion Results in Litigation.**

21.     Significant delays in project completion resulted in litigation.   The Debtors' principal contractor, ProEnergy Services, LLC ("PES") commenced arbitration against the Debtors and certain of their affiliates, alleging payment defaults and defaults on infrastructure related deliverables.  The Debtors contested PES's claims and asserted counterclaims against PES.

22.     PES, the Debtors, and other parties in interest reached a settlement of the claims raised in the arbitration.  However, the Debtors were unable to timely pay PES the settlement amount required under the settlement agreement.  As a result of this default, PES has asserted its right to an agreed arbitration award.  Prior to the Petition Date, PES filed suit in state court to obtain a judgment to enforce its arbitration award.  It also sought a temporary restraining order and immediate execution on its judgment.  These actions were stayed upon the commencement of the Cases.

**(b)     SENA Terminates the HRCOs.**

23.     SENA entered into a long term heat rate call option (HRCOs) agreement with the Project Companies.[6]

---

[6] A high level overview of HRCOs: "The heat rate is the efficiency with which a power plant converts the calorific content of the fuel into electricity.  Broadly simplifying, the variable cost of producing power is the unit's heat rate multiplied by the cost of fuel.  In a HRCO, the power offtaker makes a periodic fixed payment to the power generator (the option premium) for the right to 'call' the plant at a specified heat rate. The heat rate in the contract is typically matched with the plant's heat rate."  *Power Market Update: Knowledge Speaks But Wisdom Listens*, S&P Global Ratings, RatingsDirect (May 23, 2017)

(available at https://www.spglobal.com/_assets/documents/corporate/mg/Aneesh-Hedging-Paper.PDF).

24.     Due to the well-documented polar vortex and associated freezing temperatures in Texas in early 2021, the cost of natural gas skyrocketed, resulting in extraordinarily unfavorable positions for the Debtors under the HRCOs.  After the weather event, SENA asserted that the Debtors' exposure under the HRCOs totaled approximately $80 million.

25.     The Debtors and SENA entered into negotiations in an attempt to find a resolution of SENA's claims that would allow the Debtors' Facilities to continue to operate.  However, on June 15, 2021, SENA gave  notice of the termination of the HRCOs, leaving the Debtors without a contracted off-taker for the energy produced by the Facilities..  As a consequence of SENA's actions, coupled with the Debtors' lack of remaining capital, the Debtors were forced to cease power production.

26.     In connection with such notice, SENA called approximately $12 million in two letters of credit, which were issued by M&T Bank to secure the Debtors' obligations to SENA and were backed by the Revolving Notes.  M&T Bank honored the letters of credit.  The Debtors failed to honor their reimbursement obligations to M&T Bank, and one of the Senior Secured Noteholders, The Prudential Insurance Company of America, reimbursed M&T Bank as required under the Prepetition Senior Secured NPA, thus increasing the aggregate claims of the Senior Secured Noteholders under the Senior Notes by approximately $12 million.

27.     In connection with the HRCOs, SENA has also served as the Debtors' Qualifying Scheduling Entity, referred to as a "QSE," which is an entity that offers to sell and/or bid to buy energy in the ERCOT market.  ERCOT requires that all market participants designate a QSE registered with ERCOT.  Without a QSE, the Debtors are not permitted to transact into the ERCOT market.  Although SENA notified ERCOT of its intention to terminate its QSE relationship with the Debtors, it later rescinded that notice.  The Debtors and SENA are currently in negotiations for

a new contract that would allow the Debtors to operate the Facilities and sell power into the ERCOT market.

28.     Based on SENA's assertions, as much as $68 million may remain owing to SENA as a general unsecured claim in connection with the terminated HRCOs.

**(c)     Insurance.**

29.     The Debtors' property insurance coverage was suspended for non-payment under its premium finance agreement prior to the Petition Date, increasing the Debtors' potential exposure.  Through the First Day Pleadings, the Debtors seek authority to reinstate and obtain new insurance policies on a post-petition basis.

**(e)     Prepetition Sale Efforts.**

30.     As their financial and operational problems escalated, the Debtors engaged in discussions with potential buyers regarding a possible out-of-court sale of the Facilities.  However, because of various issues, including potential successor liabilities and  ongoing litigation, no potential buyer was willing to purchase the Facilities outside of the bankruptcy process.  Even if the Debtors had been able to find a buyer that would be willing to close an out-of-court sale, the Debtors believed that such a sale would result in a drastic reduction in the sale price compared to a sale of the assets with the protections and enhanced certainties available through a bankruptcy sale.  With operational revenues having ceased prepetition, the Debtors lacked liquidity to run a sale process in or out of court.

**(f)     Cooperation Agreement.**

31.     After months of negotiations, on June 25, 2021, the former managers of the Debtors and the Senior Secured Noteholders executed a cooperation agreement (the "Cooperation Agreement") that paved the way for the Debtors' consensual entry into chapter 11.  Pursuant to

resolutions required under the Cooperation Agreement, I was authorized to commence these Cases and take other actions necessary to preserve the value of the Debtors' businesses.

## THE CASES

32.     The commencement of the Cases establishes a clear path.  The Debtors will seek approval of postpetition financing, which, if approved, will provide necessary liquidity to stabilize the business, restore operations, maximize revenues during the peak Texas energy season, and retain professionals to engage in a robust marketing and sale process for the Debtors' assets.

33.     Selling their businesses as going concerns will maximize the sale price, all while providing power to ERCOT, jobs to vendors and contractors, and much needed revenue to contract counterparties, as well as generating funds to offset the costs of these Cases.  A sale under section 363 of the Bankruptcy Code will maximize value of the Debtors' assets and inure to the benefit of all stakeholders.

## FIRST DAY PLEADINGS

(a)     ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing Senior Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use Of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 363 And 364, And (Iv) Granting Related Relief* (the "__DIP Motion__") [Docket No. 37].**

34.     Concurrently with the filing of this Declaration, the Debtors have filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Senior Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing Use Of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 363 And 364, And (Iv) Granting Related Relief* (the "DIP Motion").

35.     The Debtors have virtually no cash on hand and no current projected operating revenues.  The Debtors are insolvent and are in default under their prepetition financing facilities. They have no funds available to pay the administrative expenses of these Cases, to re-start

operations, or to support an effective reorganization absent access to a post-petition financing facility and use of cash collateral (if and when any is generated).

36.     In the days leading up to and immediately following the filing of the petitions, the Debtors' senior secured lenders offered to support the Debtors through two stages of financing: an emergency facility (the "Emergency DIP Facility") to give the Debtors breathing room to stabilize by retaining independent professionals, and securing critical insurance coverage which has lapsed, followed by a larger and more comprehensive replacement facility (the "Replacement Facility") designed to bring the plants back to operation and to fund an orderly sales process and reorganization to maximize value for the Debtors and their stakeholders.  Without immediate access to the emergency funding to stabilize the Debtors and rapid negotiation and approval of a more comprehensive post-petition financing facility, the Debtors will have no funding, let alone that required to adequately insure the Facilities, bring them back online in order to generate revenues during the peak summer energy market, administer these Cases, and to fund a process to sell the Facilities.  Pending negotiation and approval of a Replacement Facility to fund ongoing administration of these Cases, resumption of operations, and a sales process, the Emergency DIP Facility is an essential stop-gap measure at the outset of these Cases.

37.     Under the present circumstances, the Debtors are unable to obtain more favorable financing than that proposed in the DIP Documents (as defined in the DIP Motion) and have concluded, in the exercise of their sound business judgment, that the Emergency DIP Facility (as defined in the DIP Motion) represents the best financing available to them at this time.  In discussions with the Debtors, the Prepetition Secured Parties have indicated that they believe they are likely undersecured.  Accordingly, they  would not have consented to having their liens primed by a post-petition priming lien.  Thus, in order for the Debtors to obtain alternative financing, the

Debtors would have had to undertake a nonconsensual priming lien fight, which would have been costly and would have increased the level of uncertainty in these chapter 11 cases. Given the Debtors' virtual lack of funds, the Debtors determined that such a fight was not in the best interest of the Debtors or their estates. Additionally, the Debtors believe that the terms of the DIP financing offered by the Prepetition Secured Lenders are fair and reasonable.

(b)     ***Debtors' Emergency Application to (I) Retain and Employ Stretto as Claims, Noticing, and Solicitation Agent, and (II) Granting Related Relief ("Claims Agent Application") [Docket No. 32].***

38.     Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Stretto as the claims and noticing agent for the Debtors' chapter 11 cases. Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will potentially be approximately between one and two hundred parties to be noticed. In view of the number of anticipated notice parties and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of the Debtors' estates and their creditors.

(c)     ***Debtors' Emergency Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs ("Motion to Extend Deadlines") [Docket No. 33].***

39.     Pursuant to the Motion to Extend Deadline, the Debtors seek entry of an order extending the deadline for the filing of the Debtors' Schedules of Assets and Liabilities (the "**Schedules**") and Statements of Financial Affairs ("**SOFA**") to August 9, 2021. Assembling and compiling the information required for the Schedules and SOFA is a time-consuming task that requires accurate information. The prior management company is no longer managing the Debtors

and I was only recently appointed as manager of each of the Debtors and given authority to prepare the necessary documents.  The proposed financial advisor and I are currently gathering and verifying all of the Debtors' financial data.  Given the substantial burdens already imposed on the Debtors' limited resources by the urgent commencement of these chapter 11 cases, the competing demands upon the Debtors' professionals, and the time and attention that the Debtors must devote to stabilizing their business and transitioning to chapter 11, the Debtors will likely be unable to complete their Schedules and SOFA by the current deadline imposed by the Bankruptcy Rules. The requested extension will enhance the accuracy of the Debtors' Schedules and SOFA and avoid the necessity of substantial subsequent amendments.

(d)     ***Debtors' Emergency Motion for Entry of an Order Providing Adequate Assurance of Utility Payments* ("Utilities Motion") [Docket No. 34].**

40.     Pursuant to the Utilities Motion, the Debtors seek entry of an order prohibiting utility companies (collectively the "**Utilities**" or individually a "**Utility**") from altering, refusing, or discontinuing services to the Debtors on account of prepetition invoices; (ii) authorizing and approving the amount and method by which the Debtors may furnish certain Utilities with adequate assurance of payment for postpetition utility services and directing the Utilities to continue providing such services pending entry of the Final Order; and (iii) scheduling a final hearing on this Motion within 30 days of the Petition Date (the "**Final Hearing**").

41.     Several Utilities provide the Debtors with traditional utility services, such as telecommunications services, electricity, water, and other similar services that are necessary for the continued operation of the Debtors' day-to-day business operations.  A nonexclusive list of all identified Utilities is attached hereto as Exhibit 1 (the "**Utility Service List**").  The Debtors have made a good-faith effort to identify all Utilities and list them on the Utility Service List.  On average the Debtors spend approximately $22,100.00 each month for third-party Utility services,

14

calculated as a historical payment average for the 13 months preceding the Petition Date.  To provide adequate assurance of payment, the Debtors propose to deposit into a segregated account $11,053.81 (the "**Adequate Assurance Deposit**"), which represents an amount equal to approximately one-half of the Debtors' average monthly utility service costs.  To the best of the Debtors' knowledge based on our investigation to date, the Debtors do not have any existing prepayments with respect to any Utilities.

42.     Uninterrupted utility service is critical to the ability of the Debtors to operate and maintain the value of their businesses and to maximize value for the benefit of the creditors. Should any Utility refuse or discontinue service, such refusal could jeopardize the Debtors ability to maintain the value of their business and result in irreparable harm to the Debtors and their respective estates.  Accordingly, it is essential that the utility services continue uninterrupted during these chapter 11 cases.

**(e)     *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto and (II) Granting Related Relief* (the "Insurance Motion") [Docket No. 37].**

43.     Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to continue certain insurance coverage entered into prepetition and satisfy certain prepetition obligations related thereto.

44.     Prior to the Petition Date and in the ordinary course of business, Agilon entered into an insurance policy under Policy Number PO5790302P (the "**Insurance Policy**").  The Insurance Policy is with AEGIS London (Lloyds Syndicate) (the "**Insurance Carrier**"), with Aegis Insurance Services acting as agent.  The Insurance Policy provides, among other things, property damage coverage related to the Facilities.

15

45.     The annual premiums on the Insurance Policy are financed through Bank Direct Capital Finance ("**Bank Direct**").   A copy of the financing agreement with Bank Direct (the "**Premium Financing Agreement**") is attached to the Insurance Motion as Exhibit 1.  Under the Premium Financing Agreement, the Debtors were required to make an initial down payment in the amount of $96,276.34 followed by ten (10) monthly payments of $29,184.26 beginning on September 20, 2020.  Pre-petition, the Debtors failed to make two payments required under the Premium Financing Agreement.  On or about June 10, 2021, Bank Direct issued a Notice of Cancellation of Insurance Coverage.  However, the Debtors were informed that this notice only suspended coverage under the Insurance Policy and that full coverage would be restored upon payment of the full amount due under the Premium Financing Agreement.

46.     The total amount owed to bring the Premium Financing Agreement current and reinstate coverage is $66,248.68 ($58,368.52 in past due monthly payments, and $7,880.16 on account of certain late fees and cancellation fees).  While the above-referenced past due monthly payments were invoiced prepetition, they represent the last payments due under the Premium Financing Agreement and are necessary to extend the insurance coverage from the Petition Date to the Insurance Policy's termination date of August 20, 2021.  If these unpaid monthly payments are prorated on an annual basis, approximately $57,400 of the unpaid amounts is attributable to the post-petition coverage.

47.     Continuation of the Insurance Policy is essential to the preservation of the value of the Debtors' businesses and operations.  The Debtors seek authorization to pay the prepetition and postpetition amounts owing under the Premium Financing Agreement and thereby maintain their existing Insurance Policy on a postpetition basis.  If the Insurance Motion is not granted and the Insurance Policy is terminated, then the estates will likely suffer immediate and irreparable harm.

48.     The Debtors intend to seek the entry of Court orders approving each of the First Day Pleadings as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas. If the Court does not grant the relief requested by the Debtors in the First Day Pleadings on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

49.     As set forth above, I am familiar with the content and substance of the above identified First Day Pleadings. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors an opportunity to maximize the value of their estates.

50.     Accordingly, for the reasons set forth herein and in each of the respective First Day Pleadings, the Court should grant the relief requested in each of the First Day Pleadings.

*[Signature to follow]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:    July 14 2021
          Houston, TX              By:   */s/ Hugh Smith*
                                           Hugh Smith
                                           Manager
                                         Agilon Energy Holdings II, LLC, Victoria Port Power LLC, and Victoria City Power LLC